BENJAMIN B. MUSSEY *vs.* PRESIDENT, DIRECTORS, &C. OF THE EAGLE BANK.

Evidence that the teller of a bank, during all the time of his holding office, whenever the convenience of the bank or of its customers required it, certified that checks were "good," which were drawn on the bank by its customers, when funds to the amount of such checks were to the credit of the drawers, and that his so doing was, in some instances, known to the bank, and was not forbidden, and that it was the usage of the tellers of other banks to do the same thing, does not warrant a jury to infer that the power of so doing was an original, inherent, implied power of the teller, as such.

The usage of issuing certificates of deposit, by a teller of a bank, is not evidence to prove a usage of certifying checks.

A teller of a bank, as such, has no authority to certify that a check is "good," so as to bind the bank to pay the amount thereof to any person who may afterwards present it ; and a usage for him so to certify a check, to enable the holder to use it at his pleasure, is bad.

ASSUMPSIT to recover the amount of a check drawn on the defendants, on the 2d of November 1841, by George F

Cook & Co. for four thousand dollars, payable to said Cook & Co. or bearer, and on which the following words were written by the defendants' teller : "Good. H. B. Odiorne, Teller."

At the trial before *Wilde*, J. it appeared that Cook & Co. had no funds in the defendants' hands, when the check was presented for payment; that Jeremy Drake, cashier of the Freemans Bank, received the check from Cook & Co., as cash, presented it to the defendants for payment, and after payment thereof was refused, caused it to be protested, and sold it to the plaintiff for $3000.

It also appeared that Odiorne, the defendants' teller, had been in the habit of certifying that the checks drawn on the defendants by Cook & Co. were "good," and that such checks had been received as cash, at different banks, as well as by individuals.

The defendants gave in evidence the 23d article of their by-laws, which is as follows : "It shall be the duty of the teller to make all payments from the bank, including all notes or bills discounted, and to receive payment of such notes, or bills, when due; he shall account daily, and oftener if required, with the cashier, for all sums he may receive, and in case of delinquency, he shall be responsible for the amount thereof. All checks on this bank, received by the teller, shall be delivered, on the day of their receipt, to the book-keeper, to be entered by him; and all checks on other banks shall be presented for payment, before one o'clock, on the day he shall receive the same. And if the teller shall pay any check on this bank, the person drawing the same not having the amount thereof to his credit in the bank, he shall be charged with the amount overdrawn, provided the same was done without application to the book-keeper; but if the book-keeper shall have declared the check to be good, he shall be responsible for the amount overdrawn. He shall also receive all money, bills or checks, brought to the bank to be deposited, and enter the same to the credit of the person depositing them, or to the credit of such person as the depositor shall direct, he

giving a list of such deposit to the teller. Also, he shall receive payment of all notes, bills, and demands, left for collection, and when the proprietors thereof shall desire it, he shall pass to their credit the amount of bills and notes discounted."

Much testimony was introduced as to the custom of tellers of banks in Boston to certify checks as good; and upon the whole testimony in the case, (which need not be here stated,) the plaintiff's counsel requested the judge to instruct the jury as follows : " That if they should be satisfied, from the evidence, that Odiorne, from the time he became teller, and during his holding said office, certified the checks of the customers of the bank, when funds to the amount were to their credit, whenever their convenience, or that of the bank required it; and if the jury should be further satisfied that this was, in any instance, known to the bank, and not forbidden, and that, during the same period, it was the custom of all the other tellers of banks in Boston, in like manner, to certify checks; the jury would thereupon be at liberty to infer that the power thus to certify was an original, inherent, implied power of said Odiorne, as such teller, unless the existence of such power, in said Odiorne, be negatived by the other evidence in the case : That the usage of the defendants, and of the other banks in Boston, to allow certificates of deposit to be certified by their respective tellers, was evidence in support of a usage of such tellers to certify checks, or of their authority so to do: That if the jury should be satisfied, from the evidence, that it was known to the defendants that Odiorne occasionally certified as good the checks of Cook & Co., and the defendants did not prohibit the same, but acquiesced therein, they would thereby become bound to pay any checks of Cook & Co., subsequently certified by said Odiorne, whether made fraudulently or otherwise, as against a *lonâ fide* holder of such checks, without notice or ground of suspicion of want of authority, or of fraud, on the part of said Odiorne."

But the judge instructed the jury, that an original, inherent, implied power of the teller could not be so inferred ; and he

also instructed them as follows : The question is, whether the certificate of the teller, that the check was good, binds the bank. If he had any authority to bind the bank by that acceptance, the plaintiff may maintain this action. It is not contended that he had any express authority. The by-laws of the bank forbid it ; and if it stood on those, there would be no authority. And no such authority is implied from the nature, or by virtue, of the office. The case must turn upon the question, whether there is such a custom or usage as, under the circumstances, should hold the bank. Usage to issue certificates of deposit does not show such usage in case of checks. The custom, in order to bind the bank, must be a good one, and be so general as to bring home a general knowledge of it to the business community ; and the jury will judge, from all the testimony, whether a general custom is proved. Whether the custom, if proved, is good, is a question of law for the court. The general question for the jury is, whether the check was certified according to any usage or authority, and whether it was received by Drake without notice or cause to suspect that Odiorne had no authority. If Drake knew that it was not according to usage for a teller to certify checks, he could not have recovered of the defendants, though he intended no wrong, unless the defendants had held up Odiorne as a certifying officer. And the plaintiff can stand in no better position than Drake. If there was any usage authorizing Odiorne to certify checks, and this was certified according to the usage, and Drake took it in the usual course, without any circumstances to lead him to suspect any thing, then the verdict should be for the plaintiff ; otherwise for the defendants.

The jury returned a verdict for the defendants, and the plaintiff moved for a new trial ; alleging, as a cause therefor, the instructions given to the jury, and the refusal of the judge to give the instructions requested by the plaintiff's counsel. A full report of the testimony was prepared, and was presented to the court at the hearing of the motion for a new trial.

*Fletcher & Bartlett,* for the plaintiff.

*C. G. Loring & A. H. Fiske,* for the defendants.

HUBBARD, J.   It is proved that Cook & Co. had no deposit to their credit, in the Eagle Bank, at the time the check was drawn, nor when it was presented for payment; and it is admitted that the action cannot be maintained against the defendants, unless the word "good," written by their teller, and certified by his signature, binds the bank.   It is also agreed, or proved, that the teller had no direct authority conferred upon him to certify checks as good.   Unless, therefore, a teller has power, by virtue of his office, thus to bind the bank ; or a custom thus to certify checks exists among banks, for the purpose of giving them currency with third persons, on the credit of the bank ; or the defendants have sanctioned the practice of the making of such certificates, by their knowledge of its use, which they have not forbidden ; this action, it is admitted, cannot be sustained.

These several propositions embrace, substantially, the subjects which have been discussed, and upon which the plaintiff grounds his motion for a new trial.   One of the propositions of the plaintiff's counsel is stated thus :   That the jury should have been instructed, that if the proof should warrant the inference that Odiorne, while teller, certified the checks of the customers of the bank, and this was, in any instance, known to the bank, and was not forbidden ; and that, during the same period, it was the custom of all the tellers of other banks so to certify checks ; the jury would be at liberty to infer an original, inherent, implied power in Odiorne, as such teller, thus to certify checks.   But certain facts are stated, in this proposition, as furnishing evidence of inherent power, which are rather applicable to the question and binding nature of a usage.   They may prove the latter, while they by no means establish the former.   The question of inherent power, and that of usage, should be separately considered, in order to arrive at a correct conclusion.

1. And first; has the teller of a bank an original, inherent, implied power to certify checks as good, by virtue of his

office ?  Or, in other words, has the teller of a bank an inherent power to bind the bank to the payment of any given sum of money, at-a future time, to any person who shall produce a check, which he has, by writing upon it the word " good," in fact accepted to pay ?  Because, unless the word "good" carries with it binding evidence of the fact that the money is in the bank to meet that particular check, and that it will be paid to the bearer at any time when it is presented, it is of no practical utility.  It will amount to no more than this, viz. that, at the moment of presentment, the check is good, and will be paid, if then handed in ; but not that it will continue good two hours after, if, not being offered, other checks of the same drawer are presented, to the amount of his deposit in the bank.

The office of the teller is implied in the word used to designate it — to tell or count the moneys of the bank, which are received or paid out.  The office is often divided into two branches, that of. receiving teller and of paying teller, where the business of the bank is large, and the duties cannot con veniently be united in one person.  When united, the duty of the teller is, to receive all moneys offered at the bank in payment of notes and bills previously discounted or lodged for collection, as they severally fall due, and all moneys offered by customers of the bank, to be deposited to their credit in account, whether arising from moneys brought by them to the bank, or the proceeds of discounts made for them ; to pay the checks of depositors, as the money is, from time to time, drawn out, or for notes discounted ; and to redeem the bills of the bank with specie, when the same is demanded.  This is his official employment ; and, in the discharge of these duties, he is regularly to account for the moneys he has received and paid .out, not only to prevent mistakes, but to charge him when short or delinquent ; and he is also made responsible for the payment of a check, when the drawer has not a like amount to his credit, unless he applies to the book-keeper for information as to the state of the drawer's account ; and then, if an over payment is made,

through the mistake or fault of the book-keeper, he, and not the teller, is responsible for the loss. And when checks on other banks are received in payment, or on deposit, (as is the usage among the banks in the city,) it is made his duty to attend to their collection by a given hour of the day. These are the powers and duties usually assigned to the office of the teller; and they are plain and explicit. They relate to the direct receipt or payment of moneys, and to a true and accurate accounting for such receipts and payments. His duties respect the daily cash transactions of the bank, and they do not relate directly to the *credits given* by the bank to its cus- omers, or borrowers, on the loan of its funds. His office is not confounded with that of the discount clerk, or the book- keeper; but his daily minutes, and the checks paid or received by him, are handed to the book-keeper, for him to make the proper entries, by which the concerns of the bank may be known when tested by the teller's cash on hand.

In these powers and duties, thus conferred upon the teller, and to be exercised by him in the discharge of the appropri- ate functions of his office, there is no inherent, original power, expressly conferred, to enable him to certify that the checks of the depositors at the bank will be good, when presented for payment, at some future time; nor is such power incident to, or necessary to, the faithful discharge of any of his duties. Powers which are neither incidental nor necessary are not to be implied, when the rights of others are thereby involved. The power in question is, in fact, not only not implied as incidental to the proper performance of the duties of the office, but the teller is not a regular certifying officer, as to the state of any depositor's account; for he has not the means of cer- tifying it. Nor is he responsible for the book-keeper's state- ment. Nor does such power exist in the book-keeper; for, during the business hours of the day, he is not the recei-er of all the checks drawn by the depositors, as they are paid at the bank, nor is he answerable for the amount, until handed to him for entry in his books. Such certificate would, in fact, require the names of both the officers, that the drawer's

account was good for the face of the check, before either of them could have evidence of the fact to be certified. Nor could they be secure from difficulty arising out of the constant pressure of business, without actually charging the check thus certified ; and even if charged, they would be without a voucher, till the check should be handed in for payment.

Such a power of certifying is, in fact, a power to pledge the credit of the bank to its customers ; a power which, by the constitution of a bank, can alone be exercised by its president and directors, unless specially delegated by them ; and consequently, it cannot be implied as a resulting duty or authority in any individual officer. Evidence of usage, therefore, can imply no original, inherent and implied power in tellers thus to certify, however it may· bear on the question of binding a bank by the allowance of such a usage.

2. It is contended that a usage for tellers of banks thus to certify that checks are good, and such usage being known to the business community, is a usage binding on banks, and that the holder of a check so certified may recover it from the bank on which it is drawn ; and that proof of a usage, on the part of this bank and the other banks of the city, to allow certificates of deposit to be certified by their respective tellers, is evidence in support of a usage of such tellers to certify checks, or of their authority so to do.

Upon this point, the judge, at the trial, instructed the jury, that if any such general usage existed, and if it was a good usage, the defendants would be bound by it ; but whether the usage was good or not, was matter of law for the court to decide, and was not a question for the jury; and that a usage to issue certificates of deposit was not evidence to prove a usage of certifying checks.

In examining the evidence which was offered to the jury, and which is reported at some length, we are well satisfied that no such general usage has been proved ; but that, in some of the banks, a practice has existed for one of the officers of the bank, and generally the teller, to certify that the check of

a depositor is good, when it was necessary for him to use his check at another bank, after bank hours, to prevent the protest of a note; in which case, his check would, of course, be presented for payment, the next morning, by the bank receiving the same; or occasionally, when a remittance was to be made to a correspondent at a distance; and sometimes, for the convenience of the officers, where the money was needed, to be paid at another bank, and the amount of the check was large, to save the labor of counting the bills. The cases vary from the one at bar. They were evidently those of special convenience for a particular occasion, and which, from the uprightness of the officers and the solvency of the parties, worked no mischief. But even these cases were neither proved to be general, nor applicable to all the banks, so as to establish a usage. The case at bar, on the other hand, was the giving of large credits to the persons drawing the checks, to enable them to borrow money on the strength of the certificates. In some banks, checks were occasionally certified for customers, to be used by them, at their convenience, where the funds were in the bank to meet them; but the practice, as proved, was of such limited extent as not to bear on the question of usage.

But if a usage had been proved of the certifying, by the teller, that the check is good, to enable a holder to use it afterwards, at his pleasure, we are clearly of opinion that such a usage would be bad, and could not be upheld. It would give to bank checks, which are intended for immediate use, and are the substitutes for specie, in the ordinary transactions of business, the character of bills of exchange, payable to the bearer, the bank being acceptor, and payable at an indefinite time. It would lead to loans to favored individuals, without the usual security; it would substitute checks for cash, in the hands of tellers who receive them, and would confer the power upon a single officer to pledge the credit of the bank by the mere writing of his name; a power never contemplated by the legislature, nor intended to be conferred by the stockholders. It would expose the teller to the frauds of a

book-keeper, and both of them to the temptations of unprincipled and greedy men, who might, under various pretences, procure their checks to be thus certified, in the first instances, when their deposits were good, and afterwards, when there was no balance to their credit; allowing interest, as a bonus for the certificate, to the certifying officer, who would afterwards receive such checks as cash. And the present case well illustrates the hazards and the evils to which banking companies and their officers are exposed by the allowance of such a practice.

It has been pressed, in the argument on the subject of usage, that this certificate of "good," on the check, is but another form of the exercise of a usage, so common in banks, to grant, by the teller, a certificate of deposit of money to the credit of a third person. But we are of opinion, with the judge before whom the trial was had, that usage of the one will not support the practice of the other. The two practices, while having the appearance of resemblance, and although one may be used for the same purpose as the other, in the form of a remittance, are, in their character, essentially distinct. A certificate of deposit is regularly issued only when money is actually paid into a bank, for the benefit of a third person, and is placed to his credit; by means of which certificate, and on the return thereof, he can draw for the money deposited; or, if the money is not actually deposited, but the check of the party procuring the certificate is given, such check is immediately charged to the account of the drawer. This is a transaction in which money is actually paid for the certificate; and the certificate is no more than entering the amount in the depositor's bank book. The difference is, that the credit is given to the correspondent of the depositor, and not to the depositor himself. But where a check is certified, as in the case at bar, no money is deposited, no check is received, and the teller can only rely on the declaration of the book-keeper that the check is good. The transaction enters not into the books of the bank; is not necessarily known by its higher officers; and yet, it is contended, the bank is bound by the transaction.

In examining the evidence, it is apparent that the defendants have never sanctioned the practice of authorizing their teller to certify checks as good, in order to their being used, by the drawer, to raise a credit with third persons. And, admitting it to be proved, (though of that we are not satisfied,) that the cashier, in one instance, knew that the teller certified a check of Cook & Co. as good, and did not prohibit him, still, the teller having no legal right, either express or implied, thus to obligate the bank, the knowledge of the cashier could not affect the defendants. Such an acquiescence on the part of the cashier, whether the consequence of haste, or ignorance, or improper motive, or a mistaken view of his own powers, could not create a contract between the bank and the holder of any other check thus certified.

What the legal consequence would be, if the check was good at the time of such certificate, and was certified with the knowledge and acquiescence of the cashier, and was taken, *bonâ fide*, on the faith of such certificate so approved, we are not now called upon to express an opinion.

The view taken of the case makes it unnecessary to decide on that part of the instructions of the presiding judge, whether Drake took the check under such suspicious circumstances that he was bound to make inquiry. Leaving this subject, therefore, for future consideration, if the point should hereafter arise, we are satisfied that the instructions were sufficiently favorable to the plaintiff, and that there is no just cause for disturbing the verdict.

*Judgment on the verdict.*